IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Gwen Parker, | ) | C/A. No. 6:04-22166-RBH |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Reliance Standard Life Insurance Co., | ) | |
| Laurel Baye Healthcare, LLC, and the | ) | |
| Laurel Baye Healthcare Group Long Term | ) | |
| Disability Insurance Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action was initiated by the filing of a complaint on September 9, 2004 alleging a claim for long-term disability benefits (LTD) under the Employee Retirement Income Security Act (ERISA). The defendants filed an answer on October 12, 2004. On April 7, 2005, the defendants filed a motion for summary judgment. On August 12, 2005, the plaintiff filed a cross motion for summary judgment.

This matter is before the court pursuant to the parties' Joint Stipulation, wherein it was agreed that the Court may dispose of this matter based upon the Joint Stipulation, the administrative record, the plan documents, and each party's memorandum in support of judgment. The Court shall treat the cross motions for summary judgment as the parties' cross memoranda in support of judgment. [1]

---

[1] The Fourth Circuit has recognized that there is no prohibition against the parties agreeing to do away with the summary judgment standard and simply allowing the court to dispose of a matter on its merits by way of stipulation. See Bynum v. CIGNA HealthCare of North Carolina, Inc., 287 F.3d 305 (4th Cir. 2002), footnote 14, where the court stated:
"While the parties' agreement to waive the summary judgment standards and submit their case to the district court on its merits seems to be unique, the ERISA statute does not preclude such an agreement. See also Tester v. Reliance Standard Life Ins. Co., 228 F.3d 372, 374, 377 (4th Cir. 2000) (affirming decision of district court after bench trial where parties agreed for court to decide ERISA claim on merits and doing away with summary judgment standard.)."

## Facts

Laurel Baye established a plan providing group long term disability (LTD) benefits, which is governed by ERISA. The Plan provides eligible employees with certain benefits in the event of long-term disability as defined under its terms. The LTD Plan is funded by Reliance Standard Group LTD Policy No. LSC 105445. Reliance Standard is the claims administrator for the plan and, as such, an ERISA fiduciary. Reliance Standard denied the plaintiff's benefits on the basis of a pre-existing condition. It also found that the plaintiff failed to demonstrate she was laboring under a disability as defined by the written terms of the plan.

Plaintiff became employed by Laurel Baye Nursing Home as an LPN/Charge Nurse in early April of 2002. She became covered by the Plan on August 1, 2002. She filed for disability benefits beginning July 15, 2003. Plaintiff alleges that she was unable to work due to Reflex Sympathetic Dystrophy ("RSD") of her left foot and lower extremity following hammer toe surgery. (Plaintiff's Memorandum in Support of Summary Judgment, p. 2) Surgery was performed on the second, fourth, and fifth digits of her left foot by podiatrist, Dr. A.L. Mathis, on March 20, 2003. (AR0458-460). The podiatrist also performed a plantar fascial release.

## Provisions of the Plan

The Reliance Standard policy contains the following limitation on benefits for a pre-existing condition:

> **PRE-EXISTING CONDITIONS**: Benefits will not be paid for a total disability:
>   (1) caused by;
>   (2) contributed to by; or;
>   (3) resulting from;
> a Pre-existing Condition **unless the Insured has been Actively at Work for one (1) full day following the end of 12 consecutive months from the date he/she became an Insured.** (emphasis added)

(AR0172)

The policy defines Pre-existing Condition as:

any Sickness or Injury for which the Insured received medical treatment, consultation, care or services, including diagnostic procedures, or to prescribe drugs or medicines, **during the three months immediately prior to the insured's effective date of insurance.** (emphasis added)

(AR0161)

## Procedural History

The initial denial letter dated December 15, 2003 found that the benefits were barred based on the pre-existing condition clause of the policy. The claims examiner found that, since the plaintiff was not at work for twelve months plus one day after she became insured, it was appropriate to review medical information for treatment during the three months immediately prior to the effective date of the policy (May 1, 2002 through August 1, 2002). The examiner found that the plaintiff was treated for pain in her left foot during those three months based on records from "Dr. Robert Anderson" showing treatment on June 24, 2002 for pain in the left fifth toe. "Given these facts, we have determined you had treatment for related condition during the three-month period prior to your effective date of coverage and your claim must be denied."

On May 11, 2004, Plaintiff appealed the denial of benefits, noting that Dr. Anderson (an orthopaedist) did not treat the plaintiff until July of 2003, but that Dr. Merrill Gildersleeve (an internist) treated the plaintiff on June 24, 2002 for a callus on the fifth digit of her left foot. In her appeal, the plaintiff argued that there was no relationship between the callus and the subsequent hammer toe surgery; she also contended that there was no medical evidence that the Reflex Sympathetic Dystrophy (RSD) of her left foot for which she sought benefits was related to the hammer toe surgery. On May

13, 2004, Plaintiff supplemented her appeal with a letter dated May 7, 2004 from Dr. Gildersleeve to her attorney which states:

> Ms. Parker has been a patient of mine since January, 2002. I have followed her more frequently since September of 2003. Prior to that September visit, I had last seen her in June of 2002. At that time, she was noted to have a callus over her left 5th toe with associated pain, some degenerative arthritis in the hands and resolved sciatica. When I saw her September 24, 2003 she noted that she was having persisting pain and swelling in the left foot and that she had developed RSD following surgery for correction of toe deformities in that foot in June (sic) of 2003. She did not, prior to that, complain to me of similar symptoms.

On May 21, 2004, Plaintiff again supplemented her appeal with a note of the same date from Dr. Gildersleeve, stating: "The callus on Mrs. Parker's left 5th toe which I evaluated on June 24, 2002 was not related to an RSD and subsequently resolved with simple treatment measures. It is unrelated to her subsequent surgery which involved multiple digits and resulted in an RSD problem." Dr. Gildersleeve stated, "to say that the fifth toe problem was causative stretches causation beyond possibility."

On June 22, 2004, Reliance Standard notified counsel for the plaintiff that the information in the claim file was being sent to a reviewing physician. The examiner obtained an independent medical report from Dr. Steven J. Feagin dated July 28, 2004. Dr. Feagin, in a comprehensive report, concluded that the callus on the fifth toe in June of 2002 was, in his opinion, related to the later problems which resulted in surgery; he also opined that the surgery was a traumatic event that caused the RSD.

> Regardless, understanding of hammertoe deformities, their insidious development over long periods of time, and how they manifest themselves clearly supports the contention that they were present and symptomatic at the time of the 6/24/02 office visit and the prior encounter that has not been provided. The following is a description of hammertoes from <u>Bedside Diagnostic Examination</u> by DeGowin: Fixation of smaller toes and flexion: **Hammer Toe**. Usually the second

>toe is involved.  The proximal joint is fixed in dorsiflexion, the middle joint is fixed in plantar flexion while the distal joint is freely moveable. **A corn or inflamed bursa frequently occurs on the prominent joint.**

(emphasis added)

>Dr. Feagin further opined,

>It is quite clear that the lesion on the left little toe, described by the claimant as a 'corn', was indeed a manifestation of toe deformity since the physician noted that the lesions tended to 'rub on her shoes'.  The physician (Dr. Gildersleeve) indeed noted a 'callus' and suggested 'padding' and documented his intention to refer her to a podiatrist.  Such a referral would not be needed for a simple corn, whereas it was totally appropriate in the setting of the underlying foot and toe deformities.

By letter dated August 10, 2004, Reliance Standard notified plaintiff's counsel of its decision on the appeal.  The letter finds that "the condition for which Ms. Parker is claiming disability, RSD, is 'caused by, contributed to by, or resulting from' her Pre-existing Condition of hammertoe deformity 5th digit" and that she received treatment for such condition during the Pre-existing Condition Period under the policy.

**Standard of Review**

The parties stipulate that the proper standard of review is a modified abuse of discretion standard.  (Jt. Stip. ¶ 3).[2]  Furthermore, the parties stipulate that the Court may dispose of this matter consistent with the submitted joint stipulation, administrative record, and memoranda in support of judgment.  (Jt. Stip. ¶ 8).

---

[2] The pertinent plan document provides:
Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan.  The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.
(Jt. Stip. ¶ 6)

The abuse of discretion standard applies "where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997). Under an abuse of discretion standard, a decision will not be disturbed if it is reasonable, even if the Court disagrees with the ultimate decision. Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000). When an administrator is granted discretion by the terms of an ERISA plan

> a court reviews the administrator's decision to deny benefits for an abuse of that discretion, asking whether the denial of benefits was reasonable, Bernstein v. CapitalCare, Inc., 70 F.3d 783, 787 (4th Cir. 1995) (citation omitted), "based on the facts known to [the administrator] at the time." Sheppard v. Enoch Pratt Hosp., [Inc., 32 F.3d 120,] 125 [(4th Cir. 1994)]. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Bernstein, 70 F.3d at 788 (internal quotation marks and citation omitted).

Stup v. Unum Life Ins. Co. of America, 390 F.3d 301, 307 (footnote omitted).

The abuse of discretion standard is modified where, as here, a plan fiduciary or administrator is "operating under a conflict of interest." Ellis, 126 F.3d at 233. In the instant case, Reliance Standard, as both insurer and administrator of the plan, acted under a conflict of interest because "its decision to deny benefits impacted its own financial interest because it 'both administers the plan and pays for benefits received by its members.'" Stup, 390 F.3d at 307. The Supreme Court has instructed that this conflict of interest "*must* be weighed in determining whether there is an abuse of discretion." Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 342 (4th Cir. 2000) (emphasis in original) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). Under a modified abuse of discretion standard, "we will not act as deferentially as would otherwise be appropriate. . . . [T]he fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any

6

untoward influence resulting from the conflict." Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993); accord, Ellis, 126 F.3d at 233; Bedrick v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir. 1996).

> Under this sliding-scale standard of review, "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." Ellis, 126 F.3d at 233.

Stup, 390 F.3d at 307 (footnote omitted).

Since the appropriate standard of review in this case is a modified abuse of discretion, this Court's review is limited to the evidence that was before the claims administrator at the time of the decision.[3] See Sheppard v. Enoch Pratt Hospital v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994).

## Legal Analysis

The question before the Court is whether, after taking into account any conflict of interest and the evidence before Reliance Standard at the time it made its claim decision, Reliance Standard abused its discretion in concluding that plaintiff's claim was barred by a pre-existing condition and, if so, whether she failed to show she was disabled.

A participant's entitlement to an "award of benefits under an ERISA plan is governed in the first instance by the language of the plan itself." S.S. Trade Ass'n Int'l Longshoreman's Ass'n v. Bowman, 247 F.3d 181, 183 (4th Cir. 2001). In other words, the written language of an employee benefit plan

---

[3] In contrast, when a district court conducts a de novo review of ERISA benefits claims, i.e., where the benefit plan does not give the administrator or fiduciary discretionary authority to determine eligibility for benefits, it may, in its discretion, consider evidence that was not before the plan administrator. See Quesinberry v. Life Insurance Co. of North America, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc). "The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." Id. Admission of such evidence may be warranted "[i]f administrative procedures do not allow for or permit the introduction of the evidence" but not where it is merely "cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant mustered for the claim review." Id. at 1027.

determines an employee's *entitlement to benefits and the amount of those benefits.* See Dameron v. Sinai Hospital Baltimore, Inc., 815 F.2d 975, 978 (4th Cir. 1987); Pizlo v. Bethlehem Steel Corp., 884 F.2d 116 (4th Cir. 1989). As claims fiduciary for the plans, Reliance Standard is obligated to plan participants to follow the written terms and conditions of the plans in reviewing disability claims. See 29 U.S.C. § 1104(a)(1)(D); Pegram v. Herdich, 530 U.S. 211, 223-24 (2000).

Plaintiff argues that the initial denial letter does not comply with ERISA regulations[4] since it references the wrong medical provider and refers to pre-existing conditions as "related conditions". The Court finds that any procedural irregularities with the initial letter, such as referencing the incorrect doctor's name, were insignificant and do not provide a basis for this court to enter judgment in favor of Ms. Parker. Under the law of this Circuit, substantial compliance with the ERISA regulations is sufficient. Ellis v.Metropolitan Life Ins. Co., 126 F.3d 228, 235 (4th Cir. 1997); Brogan v. Holland, 105 F.3d 158, 165 (4th Cir. 1997). A plan fiduciary has substantially complied when the claimant receives "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Brogan, 105 F.3d at 165. As evidenced by the plaintiff's appeal through her attorney, plaintiff was fully aware of the reasons for the denial and provided a thorough explanation as to why she disagreed. (AR 28-34).

Plaintiff mistakenly suggests that the administrative process only involved the initial decision. Based on the provisions for appeal under Section 503 of ERISA, as well as the Fourth Circuit's exhaustion requirement, the administrative process involved both the initial denial as well as the

---

[4] ERISA plan administrators are required to "provide a claimant with . . . notification of any adverse benefit determination", including (i)the specific reason . . . for the adverse determination; (ii)reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the plan's review procedures . . . 29 C.F.R. §2560.503-1(g).

decision on appeal. See Makar v. Health Care Corp. of Mid-Atlantic, 872 F.2d 80 (4th Cir. 1989) (ERISA plans must provide internal dispute resolution mechanisms for participants whose claims have been denied. "By preventing premature interference with an employee benefit plan's remedial provisions, the exhaustion requirement enables plan fiduciaries to efficiently manage their fund; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions." Id. at 83.) By statute, employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. §1133(2).

Plaintiff additionally contends that Dr. Feagin provided the only medical opinion linking the callus on the left fifth toe in June of 2002 to the hammer toe surgery in March of 2003. Plaintiff argues that Dr. Gildersleeve did not diagnose her with hammer toe deformity at the time of the June 24, 2002 office visit and specifically states in his subsequent notes to her attorney in 2003 and 2004 that the callus was not related to the hammer toe problem. She further asserts that the only medical evidence in the record to support the finding by Reliance of a causal link between the hammer toe surgery and the RSD is the report by Dr. Feagin.

While it is true that Dr. Gildersleeve did not specifically mention a hammer toe abnormality in his June 24, 2002 office note, he noted that plaintiff "continues to have pain in the left little toe. This tends to rub on her shoes, is red and swollen and painful." (AR 553). Dr. Gildersleeve described a "callus" on the left fifth toe and states: "Will refer her to a podiatrist for her toe and suggested padding." (AR 553-554). Moreover, Dr. Gildersleeve states that he did not see the plaintiff between the dates of June 24, 2002 and September of 2003. Therefore, he would have not have been able to ascertain

9

whether or not the callus disappeared between June of 2002 and February of 2003, when the plaintiff consulted the podiatrist, Dr. Mathis.

On February 11, 2003, the plaintiff consulted Dr. Mathis, the podiatrist who later performed the hammer toe surgery. Dr. Mathis' notes reference "significant pain at the 5th digit HD bilaterally and at the rt 2nd digit at the proximal inner phalangeal joint. She states that her lt foot elicits increased more pain than the rt." AR 509. He also refers to a "significant increase in soft tissue density at and about the fifth digit . . . .Symptomatic hammertoe deformity." (AR 509). The callus/corn referred to both during the pre-existing condition period and at the time of surgery is not the only indication that the June 2002 treatment was related to hammer toe deformity. When Ms. Parker was seen by her podiatrist on February 11, 2003, she complained of pain while wearing her shoe. (AR 429). The records of Dr. Mathis concerning the surgery were also made a part of this record. In those records, the doctor states: "PREOPERATIVE DIAGNOSES– . . . **fifth digit hammertoe deformities with heloma durum and heloma molle**." (emphasis added) (Greenville Hospital System Medical Record, AR0458).

According to Dorland's Illustrated Medical Dictionary 740 (28th ed. 1994), the term "heloma" is defined as "a corn or callosity on the hand or foot". "Durum" means "hard corn" and "molle" means "soft corn". Id. Dr. Feagin's report reviews the podiatrist's records as follows: "The x-rays showed the soft tissue density involving the 5th digit (little toe) and indeed the podiatrist's operative indications included heloma formation (callosity or corn) in conjunction with the hammer toe deformities." (AR 0430) The record does not reveal that the plaintiff requested an opinion by Dr. Mathis, who was the physician whose knowledge was arguably the most relevant as the foot surgeon, as to the connection between the callus in 2002 and the hammer toe surgery which he performed. However, the above-cited portions of his records at a minimum show the presence of a callus on the fifth toe when he was

10

consulted in February of 2003. While the plaintiff alleges that her callus which occurred in June 2002 was cured and not related to her seeing the podiatrist eight months later in February of 2003, the only medical evidence regarding this fact is the handwritten notes of Dr. Gildersleeve which did not occur based on a contemporaneous examination but rather were written to her attorney after she had already had the foot surgery in March of 2003. The Court cannot say that the finding by Reliance that the 2002 callus was connected with the 2003 hammer toe surgery is not supported by substantial evidence. As explained by Dr. Feagin, hammertoe problems develop over long periods of time, and corns frequently occur on the joint.

It is not significant that the specific diagnosis of hammer toe deformity was not made until after June of 2002. In Booth v. Wal-Mart Stores, Inc., 201 F.3d 335 (4th Cir. 2000), the plaintiff argued that the preexisting condition exclusion did not apply since none of the prior treatment records specifically diagnosed her with coronary artery disease. The Fourth Circuit held that similar language was quite broad but nonetheless valid. Even though the condition for which the claim was submitted was not specifically mentioned during the pre-coverage period, since the claimant was treated for that condition or a symptom of it and it was the same condition for which benefits were sought, the Fourth Circuit concluded that the decision of the district court in favor of the claimant was erroneous and reversed the judgment. Booth, 201 F.3d at 345-346.

Additionally, the finding of the plan claims examiner that the reflex sympathetic dystrophy ("RSD") was caused by the hammer toe deformities surgery was also supported by substantial evidence. It was not until shortly after plaintiff underwent surgery for the hammer toe deformities that she developed RSD. (AR 428) Several of plaintiff's doctors stated that the pain associated with RSD started with the surgery. In fact, Dr. Gildersleeve specifically states that the surgery "resulted

in an RSD problem." (AR 428-429) Dr. Anderson, the orthopaedist who treated the plaintiff in 2003 for the RSD, stated in his treatment notes dated September 23, 2003 that he did not believe that the pain was "an intrinsic one related to her prior surgery." (AR0516) However, he wrote a letter dated December 2, 2003 in which he states:

> This appeared to have followed prior surgical intervention to the foot, this in March of 2003. It is difficult to determine the exact relationship between her prior surgery and the development of this sympathetic mediated pain pattern, although this process has been known to follow routine and uncomplicated foot surgery. (AR0511)

There is no evidence that Ms. Parker experienced trauma to her foot at any other time following the June 24, 2002 office visit with Dr. Gildersleeve other than the March 2003 hammer toe surgery. In addition, Dr. Feagin explains that "sympathetic mediated pain almost always occurs in a limb that has in some way been traumatized. Surgery is indeed planned or controlled trauma and even minor procedures can be complicated by the development of RSD." (AR0428) There is also a temporal connection between the surgery and the onset of the RSD. (The surgery occurred on March 20, 2003 and the plaintiff received treatment for RSD in 2003.) Thus, there is a clear causal link between the surgery and the RSD.

After reviewing the Administrative Record and applying the aforementioned standard of review, the court finds the defendant's denial was reasonable; there was substantial evidence to support defendants' denial of benefits, arrived at after a deliberate, principled, reasoning process; and there was no abuse of discretion. This Court is sympathetic with the plaintiff and believes that she is disabled; however, it is not necessary to address the evidence purporting to establish disability due to the Court's finding that the finding by Reliance regarding a pre-existing condition is supported by substantial evidence in the claim record and did not constitute an abuse of discretion

and the Court's finding that there is sufficient evidence of a medical connection between the callus in 2002 and the hammertoe surgery in 2003 and a causal link between the hammer toe surgery and the RSD.

## Conclusion

For the aforementioned reasons and based on the evidence before Reliance Standard, the court concludes that Reliance Standard did not abuse its discretion, its denial of benefits was reasonable, and accordingly, it is entitled to judgment in this case. It is therefore **ORDERED** that Defendants are granted judgment in their favor.

**IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, SC
March 31, 2006